

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

April 11, 2008

**BY HAND**

The Honorable Gerard E. Lynch
United States District Judge
Southern District of New York
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street
New York, New York 10007

        Re:    <u>United States v. Hector Gabriel Perez-Gallegos</u>
                  No. 08 Civ. 1197 (GEL)
                  No. 04 CR 1274 (GEL)

Dear Your Honor:

    The Government respectfully submits this response to Hector Gabriel Perez-Gallegos's Memorandum of Law and Facts in Support of a Motion to Vacate, Set Aside, or Correct Sentence Pursuant to 28 U.S.C. Section 2255 (the "Petition"), and this Court's order of March 10, 2008, directing the Government to respond to the Petition. Petitioner claims that he was denied effective assistance of counsel because his lawyer failed to: (1) explain the "plea agreement," (2) object to the Court's statement at sentencing that Perez-Gallegos had a history of resisting arrest; (3) argue that a 16-level sentencing enhancement is an issue that should have been submitted to a jury; and (4) argue that Perez-Gallegos's status as a deportable alien should be taken into account at sentencing. In addition, Petitioner claims that an amendment to the United States Sentencing Guidelines relating to criminal history calculations directs a lower sentence in Petitioner's case. For the reasons stated below, Petitioner's claims are without merit and should be denied.

**BACKGROUND**

    Indictment 04 Cr. 1274 (GEL) was filed on December 2, 2004, charging Petitioner with one count of illegal re-entry following deportation subsequent to the commission of an aggravated felony, without having obtained the express permission of the Attorney General of the United States, in violation of Title 8, United States Code, Sections 1326(a) and (b)(2).

    On February 18, 2005, Perez-Gallegos pleaded guilty to the Indictment, without the benefit of a plea agreement. On July 5, 2005, this Court sentenced Perez-Gallegos to a term of

Hon. Gerard E. Lynch
April 11, 2008
Page 2

77 months' imprisonment, to be followed by three years of supervised release, and imposed a mandatory special assessment of $100.

Perez-Gallegos filed a notice of appeal on July 6, 2005. On February 26, 2007, the Court of Appeals affirmed the judgment of this Court.

On or about July 21, 2005, Perez-Gallegos filed a *pro se* "Memorandum of Law in Opposition to [his] Sentence." This Court treated the memorandum as a motion to reconsider or reduce Perez-Gallegos's sentence, and denied the motion in an order dated July 25, 2005.

The Petition is dated February 5, 2008. On March 10, 2008, this Court directed Steven Statsinger, Esq., who represented Perez-Gallegos in the District Court proceedings, to file an affirmation responding to the factual allegations in the Petition relating to the claims of ineffectiveness of counsel. The Court also ordered the Government to respond.

Petitioner is currently serving his sentence.

## STATEMENT OF FACTS

### A.    Petitioner's Offense Conduct

Perez-Gallegos, born in Honduras in 1970, reportedly entered the United States in 1990. *See* PSR. ¶¶ 39, 42[1]. On April 14, 1994, Perez-Gallegos pled guilty in New York County Supreme Court to three separate drug-related felony counts. *See* PSR ¶¶ 22-28. The charges stemmed from the sale of cocaine in September 1992, the possession of cocaine in March 1993, and the sale of an unidentified controlled substance in March 1994. *Id.* Perez-Gallegos was convicted of one count of criminal sale of a controlled substance in the third degree and two counts of criminal possession of a controlled substance in the third degree, and he was sentenced to 20 months' to 5 years' imprisonment. *Id.* Perez-Gallegos was released on parole on November 22, 1994, and was deported to Honduras on February 21, 1995. *See* PSR ¶¶ 4, 27, 44.

At some point after his deportation, Perez-Gallegos re-entered the United States, but his renewed presence was not discovered by immigration authorities – despite additional convictions – until he submitted his fingerprints in connection with a liquor license application in North Carolina. *See* PSR ¶ 5. Perez-Gallegos was arrested in North Carolina and extradited to New York, due to an outstanding parole violation. *Id.* At the time of his North Carolina arrest, Perez-

---

[1] "PSR" refers to the Presentence Investigation Report prepared by the United States Probation Office ("Probation Office") in connection with Petitioner's sentencing. A copy of the PSR is attached as Exhibit A.

Hon. Gerard E. Lynch
April 11, 2008
Page 3

Gallegos told law enforcement that he had returned to the United States in 2000 through Laredo, Texas. *Id.*

### B.     The Indictment and Guilty Plea

#### 1.     The Indictment

On December 2, 2004, a federal grand jury in the Southern District of New York indicted Perez-Gallegos for violating Title 8, United States Code, Section 1326(a), which makes it unlawful for a deported alien to re-enter the United States without the express consent of the Attorney General.  The Indictment also alleged that Perez-Gallegos had been deported after conviction of an aggravated felony, thereby subjecting him to the enhanced penalty provisions of Title 8, United States Code, Section 1326(b)(2).  Petitioner was represented by the Federal Defenders of New York, Inc. from the time of his initial appearance on that charge through his sentencing.

#### 2.     The *Pimentel* Letter

On February 18, 2005, Perez-Gallegos pled guilty before this Court.  Before the plea proceeding, the Government provided Perez-Gallegos with a letter pursuant to the Second Circuit's suggestion in *United States* v. *Pimentel*, 932 F.2d 1029 (2d Cir. 1991).  In this letter (the "*Pimentel* letter"), the Government stated its view of how the United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") applied to Petitioner's case.  The *Pimentel* letter stated that Perez-Gallegos's base offense level was eight, pursuant to U.S.S.G. §2L1.2(a), and that Perez-Gallegos should receive a 16-level increase pursuant to U.S.S.G. §2L1.2(b)(1)(A), because his deportation followed a conviction for a drug-trafficking offense for which the sentence exceeded 13 months.  *See* PSR ¶ 3.  The *Pimentel* letter also stated that, assuming Perez-Gallegos clearly demonstrated responsibility and gave timely notice of his intention to plead guilty, he would be entitled to a three-level reduction for acceptance of responsibility, pursuant to U.S.S.G. §3E1.1, leaving Perez-Gallegos with an adjusted offense level of 21.  *Id.*

The Government also detailed Perez-Gallegos's prior criminal history in the *Pimentel* letter, which the Government indicated it believed resulted in six criminal history points, placing Perez-Gallegos in Criminal History Category III.  *Id.*  With an offense level of 21 and a Criminal History Category of III, the Government calculated the applicable Guidelines range as being 46 to 57 months' imprisonment.  *Id.*

#### 3.     The Plea Proceeding

Before accepting Petitioner's plea, this Court conducted a thorough allocution that complied in all respects with Rule 11 of the Federal Rules of Criminal Procedure.  *See* Plea Tr. at

Hon. Gerard E. Lynch
April 11, 2008
Page 4

2-18.[2]  During his allocution, Petitioner admitted that he illegally reentered the United States after being deported in 1995.  Plea Tr. at 14.  He also admitted that, prior to his deportation, he had been convicted for the sale or possession of cocaine.  *Id.*  Perez-Gallegos further acknowledged that his re-entry into the United States was illegal.  *Id.*

### C.    Sentencing

#### 1.    The Presentence Investigation Report

Prior to sentencing, the Probation Office prepared the PSR for Petitioner's case.  The Probation Office's offense level Guidelines calculations were identical to those set forth in the *Pimentel* letter.  The Probation Office determined, however, that Perez-Gallegos had a total of 15 criminal history points, rather than the 6 estimated by the Government, because the Government did not separately account for multiple convictions entered on the same day.  *See* PSR ¶¶ 22-36. The Probation Office therefore determined that Perez-Gallegos had an applicable Guidelines range of 77 to 96 months' imprisonment.  *See* PSR ¶ 64.  The Probation Office recommended that Perez-Gallegos receive a sentence of 77 months' imprisonment.  *See* PSR at 14-15.

#### 2.    The Parties' Sentencing Submissions

By letter dated June 6, 2005,[3] Perez-Gallegos's counsel urged this Court to sentence Perez-Gallegos to a lower non-Guidelines sentence for three reasons: (1) a Guidelines sentence for illegal re-entry "double counts" a defendant's criminal history because the Guidelines rely on it both to calculate the offense level and to determine the defendant's criminal history category; (2) adherence to the Guidelines creates "unwarranted sentencing disparities" with prosecutions brought in so-called "fast-track" districts where the Department of Justice has approved a program in which defendants who agree to waive certain rights typically receive more favorable sentencing for illegal re-entry; and (3) Perez-Gallegos had turned his life around because he had not been arrested since his 1999 release from imprisonment and he had already decided to return to Honduras.

On June 24, 2005, the Government submitted a letter in response, arguing that a Guidelines sentence was reasonable based on *United States* v. *Booker*, 125 S. Ct. 738 (2005), and the factors in Title 18, United States Code, Section 3553(a).  Among other things, the Government contended that: (1) the Guidelines provide an informed, national perspective on the

---

[2]    "Plea Tr." refers to the transcript of Petitioner's plea of guilty before this Court on February 18, 2005.  A copy of the transcript is attached as Exhibit B.

[3]    A copy of Petitioner's June 6, 2005 sentencing letter ("Sent. Ltr.") is attached as Exhibit C.

Hon. Gerard E. Lynch
April 11, 2008
Page 5

factors set forth in 18 U.S.C. Section 3553(a) and should be followed in order to avoid unwarranted sentencing disparity; (2) considering a defendant's prior convictions in terms of offense level and criminal history was reasonable; and (3) "fast-track" programs in other districts do not create an unwarranted sentencing disparity.

### 3.     The Sentencing Proceeding

On July 5, 2005, this Court sentenced Perez-Gallegos.  After advising the parties that Your Honor had already reviewed the sentencing submissions on behalf of the defendant and the Government, Your Honor heard oral argument from defense counsel and the Government on the appropriate sentence for Petitioner.  *See* Sent. Tr. at 2.[4]

At sentencing, Perez-Gallegos's attorney argued that, based on the fact that Perez-Gallegos's criminal history ended in 1999, a sentence shorter than the low end of the guidelines range would be warranted.  *See* Sent. Tr. at 6.  He further contended that the need for deterrence was reduced by the facts that most of Perez-Gallegos's family had returned to Honduras and Perez-Gallegos had already decided to return to Honduras voluntarily to care for his elderly father.  *Id.* at 6-7.  Perez-Gallegos's attorney noted that the fast-track and double-counting issues had been extensively briefed, and he concluded that the totality of the circumstances suggested that the Guidelines range was unreasonable.  *Id.* at 7-8.  Perez-Gallegos personally addressed the Court to apologize for his illegal behavior and to promise not to return to this country.  *Id.* at 12.

In determining Perez-Gallegos's sentence, this Court first considered whether Perez-Gallegos's criminal history overstated his potential for recidivism.  *Id.* at 3-5, 11, 15.  This Court determined, however, that a reduction was not warranted because of Perez-Gallegos's "widely separate drug offenses committed over a period of a year and a half," two of which were committed while out on bail from the first, as well as two separate New Jersey convictions, both of which involved "more than one act of theft or burglary."  *Id.* at 4.  Your Honor concluded that he could not say that Perez-Gallegos's Criminal History score significantly overstated Perez-Gallegos's potential for criminal activity.  *Id.* at 5.

This Court then emphasized the need to adhere to the Guidelines recommendation in illegal reentry cases.  The cases are "fairly standard," this Court observed, "and the need to treat similarly-situated persons similarly . . . further supports the imposition of the Guidelines sentence."  *Id.* at 12.

Next, this Court rejected Perez-Gallegos's double-counting argument.  Your Honor explained that the "offense of re-entering the United States is much less serious and threatening

---

[4]  "Sent. Tr." refers to the transcript of this Court's sentencing of Petitioner on July 5, 2005.  A copy of the transcript is attached as Exhibit D.

Hon. Gerard E. Lynch
April 11, 2008
Page 6

when the offense is committed by an otherwise law-abiding immigrant than when it's committed by a drug-dealing felon," and that this is a separate issue from the defendant's criminal history score. *Id.* at 13-14. This Court then rejected Perez-Gallegos's argument that "fast-track" programs created unwarranted sentencing disparities. *Id.* at 14-15.

Your Honor concluded by stating that the Court had "carefully considered the particular characteristics of this case and of this defendant" and determined that adhering to the Guidelines range best accomplished the "purposes of punishment, deterrence, and avoiding sentencing disparity." *Id.* at 15-16.

This Court proceeded to sentence Perez-Gallegos to a term of 77 months' incarceration, followed by a period of three years' supervised release, and a mandatory $100 special assessment. *Id.* at 16.

**D.      Appeal**

Petitioner appealed the judgment of this Court, arguing that the 77-month sentence imposed by this Court was substantively unreasonable because (1) other defendants receive shorter sentences in districts with "fast-track" programs; and (2) the Guideline offense level is based in part on criminal convictions and such convictions are also considered in calculating criminal history under the Guidelines. Petitioner also argued that the case should be remanded to the District Court for resentencing because of Your Honor's reference to Perez-Gallegos's "apparent history of resisting arrest when apprehended" at sentencing. (Sent. Tr. at 13).

The Second Circuit affirmed this Court's judgment on February 26, 2007. *See United States v. Perez-Gallegos*, 218 Fed. Appx. 37 (2d Cir. 2007).

Petitioner's present Petition followed.

**ARGUMENT**

**A.      Petitioner's Counsel Was Not Ineffective**

Petitioner argues that defense counsel was ineffective for failing to: (1) explain the "plea agreement," (2) object to the Court's statement at sentencing that Perez-Gallegos had a history of resisting arrest; (3) argue that the issue of a 16-level sentencing enhancement should have been submitted to a jury; and (4) argue that Perez-Gallegos's status as a deportable alien should be taken into account at sentencing. All arguments are without merit, for the reasons discussed below.

Hon. Gerard E. Lynch
April 11, 2008
Page 7

## 1.    The Applicable Law

A defendant claiming ineffective assistance of counsel must: (1) demonstrate that his counsel's representation fell below "an objective standard of reasonableness" under "prevailing professional norms"; and (2) "affirmatively prove prejudice" from counsel's allegedly defective performance. *Strickland v. Washington*, 466 U.S. 668, 687-88, 693-94 (1984). *See also Hernandez v. United States*, 202 F.3d 486, 488 (2d Cir. 2000) ("Under the *Strickland* standard, a petitioner must establish both (1) that counsel made errors so serious that defendant was deprived of reasonably competent representation and (2) that counsel's deficient performance prejudiced the defense."). Only if both of these elements are satisfied can a defendant demonstrate that his counsel made errors "so serious" that "counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment," and that the defendant was, as a result, deprived of a fair proceeding. *Strickland*, 466 U.S. at 687.

Under the first prong of the *Strickland* test, a reviewing court "'must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance,' bearing in mind that '[t]here are countless ways to provide effective assistance in any given case' and that '[e]ven the best criminal defense attorneys would not defend a particular client in the same way.'" *United States v. Aguirre*, 912 F.2d 555, 560 (2d Cir. 1990) (quoting *Strickland*, 466 U.S. at 689). Thus, the ineffectiveness inquiry should focus on "the fundamental fairness of the proceeding whose result is being challenged." *Strickland*, 466 U.S. at 696. The emphasis should not be on grading counsel's performance, but on "whether, despite the strong presumption of reliability, the result of the particular proceeding is unreliable because of a breakdown in the adversarial process that our system counts on to produce just results." *Id.*

Even if an attorney's performance was objectively unreasonable and unprofessional, the defendant must also prove prejudice. The reviewing court must assess "whether, absent counsel's deficient performance, there is a reasonable probability that the outcome of the proceeding would have been different." *Mayo v. Henderson*, 13 F.3d 528, 534 (2d Cir. 1994). "'A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" *Id.* (quoting *Strickland*, 466 U.S. at 694). Moreover, "an analysis focusing solely on mere outcome determination, without attention to whether the result of the proceeding was fundamentally unfair or unreliable, is defective." *Lockhart v. Fretwell*, 506 U.S. 364, 369, 372 (1993) ("[T]he 'prejudice' component of the *Strickland* test . . . focuses on the question whether counsel's deficient performance renders the result of the [proceeding] unreliable or the proceeding fundamentally unfair.").

A guilty plea is subject to collateral attack only if it was not made knowingly or voluntarily. *Salas v. United States,* 139 F.3d 322, 324 (2d Cir. 1998). A plea is made knowingly and voluntarily when "the defendant was advised by competent counsel, he was made aware of the nature of the charge against him, and there was nothing to indicate that he was incompetent

Hon. Gerard E. Lynch
April 11, 2008
Page 8

or otherwise not in control of his mental faculties . . ." *Brady v. United States,* 397 U.S. 742, 756 (1970). A defendant is competent to plead guilty when he has "'(1) sufficient present ability to consult with his lawyers with a reasonable degree of rational understanding and (2) a rational as well as factual understanding of the proceedings against him.'" *United States v. Berger*, 188 F. Supp.2d 307, 320 (S.D.N.Y. 2002) (quoting *United States v. Nichols*, 56 F.3d 403, 411 (2d Cir. 1995)).

### 2.    Counsel Was Not Ineffective

#### a.    Counsel Was Not Ineffective for Failing to Explain the Consequences of a Plea Agreement

Petitioner argues that his plea was not made knowingly, voluntarily, and intelligently, because "counsel failed to fully explain the consequences of the plea agreement." *See* Pet. at 1, 9. But there was no plea agreement. More to the point, Your Honor questioned Petitioner about whether his attorney had discussed with Petitioner any possible defenses he might have to the charges and whether his attorney told Petitioner the consequences of pleading guilty, and Petitioner responded affirmatively. *See* Plea Tr. at 6. In addition, Your Honor explained to Petitioner the rights he was waiving by pleading guilty. *See* Plea Tr. at 6-9. Considering that Petitioner indicated his understanding, asked no questions, and made no objection, his Petition cannot suffice to reopen proceedings. It plainly does not identify "an error of law or fact that constitutes a fundamental defect" in the proceedings warranting collateral relief. *See United States v. Bokun*, 73 F.3d 8, 12 (2d Cir. 1995) (stating that collateral relief under § 2255 is available "only for a constitutional error, a lack of jurisdiction in the sentencing court, or an error of law or fact that constitutes a fundamental defect which inherently results in a complete miscarriage of justice") (internal quotations omitted).

#### b.    Counsel Was Not Ineffective for Failing to Object at Sentencing to the District Court's Reference that Petitioner had an Apparent History of Resisting Arrest

Petitioner next argues that his counsel was ineffective because he failed to object at sentencing to Your Honor's statement that Perez-Gallegos had an "apparent history of resisting arrest." *See* Pet. at 9; Sent. Tr. at 13.

On appeal, Petitioner argued that his case should be remanded to this Court because of Your Honor's reference to his "apparent history of resisting arrest." The Court of Appeals rejected this argument and affirmed the conviction. *See United States v. Perez-Gallegos*, 218 Fed. Appx. 37 (2d Cir. 2007) (finding that Perez-Gallegos had not shown that the District Court based its decision not to impose a below-Guidelines sentence on its mistaken view that he had

Hon. Gerard E. Lynch
April 11, 2008
Page 9

resisted arrest).  The Court of Appeals declined to review Perez-Gallegos's claim that his trial
counsel was ineffective for failing to object to this Court's reference to resisting arrest.

Although there is no mention of Perez-Gallegos ever forcibly resisting arrest in the
record, this Court's explanation of the sentence imposed makes clear that Perez-Gallegos's
sentence was not based on that factor.  Your Honor provided a detailed analysis of why Perez-
Gallegos's far more serious string of five felony convictions in five years – intervening
deportation notwithstanding – merited the sentence he received:

> Criminal History Category VI is the highest category there is, and this criminal
> record is certainly not the worst I have seen by a long shot.  On the other hand, when
> carefully considering the details of [Perez-Gallegos's prior] cases, I noted that the three
> New York cases related to three widely separate drug offenses committed over a period of
> a year and a half and the second two were committed while Mr. Perez was on bail from
> the first.  Meanwhile, the New Jersey convictions stemmed from two separate indictments
> and each indictment appeared to involve more than one act of theft or burglary.
>
> So while the seriousness of the criminal record could reasonably be disputed, as to
> exactly how bad it is, it is certainly clear that the defendant is a persistent offender, and
> while the Criminal History score appears high, I can't in good conscience say that it
> significantly overstates his potential for criminal activity.

*See* Sent. Tr. at 4-5.  Later in the proceeding, Your Honor continued:

> The only mitigating circumstance that I think has any significance in this case is
> the time period in which the defendant has avoided trouble with the law.  But his
> significant criminal history, his apparent history of resisting arrest when apprehended,
> provide additional arguments against any unusual leniency.

*See* Sent. Tr. at 13.  Petitioner's sentence was, therefore, based on Perez-Gallegos's three drug-
related felony convictions in New York and two additional theft/burglary felony convictions in
New Jersey.  The one reference to resisting arrest is set forth above, and there was no further
analysis or emphasis on that fact.  That sole reference to a relatively minor perceived infraction
pales in comparison to Perez-Gallegos's five felony convictions, as carefully analyzed and
considered by this Court, and defense counsel was not ineffective in failing to correct this
otherwise insignificant misstatement.

Hon. Gerard E. Lynch
April 11, 2008
Page 10

> **c.     Counsel Was Not Ineffective for Failing to Argue that the 16-Level Aggravated Felony Sentencing Enhancement Should Be Submitted to a Jury**

Petitioner next argues that his counsel was ineffective for failing to argue that the 16-level aggravated felony sentencing enhancement should be submitted to a jury. *See* Pet. at 1, 11.  This argument is without merit in light of the Supreme Court's holding in *Almendarez-Torres v. United States*, 523 U.S. 224 (1998).

Title 8, United States Code, Section 1326(a) forbids an alien who was once deported to return to the United States without receiving permission of the Attorney General.  Subsection (b)(2) of the same section authorizes a prison term of up to 20 years for any alien described in subsection (a), if the initial "deportion was subsequent to a conviction for commission of an aggravated felony." *See* 8 U.S.C. §§1326(a), (b)(2).  In *Almendarez-Torres*, the Supreme Court held that subsection (b)(2) sets forth a sentencing factor, not a separate criminal offense. *See Almendarez-Torres*, 523 U.S. at 235.  In *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000), the Supreme Court maintained the rule that a prior felony conviction need not be proven to a jury, holding, "Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt."  Although the Second Circuit has acknowledged "a tension between the spirit of [*United States v. Booker*, 543 U.S. 220 (2005)] – that all facts that fix mandatorily a defendant's sentence should be found by a jury or admitted by the defendant – and the Supreme Court's decision in *Almendarez-Torres*, the 'prior conviction' exception nonetheless remains the law." *United States v. Estrada*, 428 F.3d 387, 391 (2d Cir. 2005).

The Government is not required to prove the aggravated felony sentencing enhancement to a jury, so Petitioner's counsel was not ineffective for failing to make that argument.[5]

> **d.     Counsel Was Not Ineffective For Failing to Argue for Leniency Based on Petitioner's Alien Status**

Petitioner claims that his counsel was ineffective for failing to argue for leniency regarding the "defendant's status as a deportable alien with family ties, and culture [sic] assimilation." *See* Pet. at 1, 23-26.  These arguments fail for the three reasons: (1) the Court was well aware that the defendant was a deportable alien; (2) defense counsel in fact pointed out defendant's family ties, and (3) defense counsel determined that a cultural assimilation downward departure was unwarranted.

---

[5]  Likewise, to the extent that Petitioner is arguing that the felony enhancement of subsection (b)(2) is unconstitutional, his argument fails under *Almendarez-Torres* and *Apprendi*.

Hon. Gerard E. Lynch
April 11, 2008
Page 11

First, Petitioner appears to argue that defense counsel was ineffective for failing to request that this Court consider the collateral consequences of his alien status as one of the sentencing factors under Title 18, United States Code, Section 3553(a). *See* Pet. at 1, 23. The Court was well aware that Perez-Gallegos was a deportable alien; indeed, he pled guilty to illegal re-entry. The fact that Perez-Gallegos was a deportable alien is clear from the plea, pre-sentence submissions, and sentencing transcript. Even if the Court had been unaware of Petitioner's status, defense counsel was not ineffective for failing to argue that Perez-Gallegos was entitled to a downward departure based on his status as a deportable alien because such a downward departure would not have been warranted in Petitioner's case. *See United States v. Smith*, 27 F.3d 649, 655-656 (D.C. Cir. 1994) (holding that even if a defendant's status as a deportable alien will lead to worse prison conditions, a court should depart only when persuaded that the greater severity is undeserved and "fortuitous").

Second, Petitioner's argument that defense counsel was ineffective for failing to argue for leniency based on Petitioner's family ties fails because defense counsel did, in fact, describe Petitioner's family ties to the Court. The defense's sentencing submission stated that Perez-Gallegos had returned to the United States because his wife and son were living in this country. *See* Sent. Ltr. at 1-2, 7. The sentencing submission also stated that Perez-Gallegos had been planning to start a business that his mother and sister could run. *Id.* at 8. At the sentencing hearing, defense counsel stated that Perez-Gallegos "is clearly someone with very strong family ties" and that Perez-Gallegos planned to return to Honduras to take care of his elderly father. Sent. Tr. at 6-7.

Third, Petitioner's apparent claim that his counsel should have argued for a cultural assimilation downward departure fails because defense counsel, in his professional judgment, determined that such a downward departure did not apply in Perez-Gallegos's situation. *See* Declaration of Steven M. Statsinger, Esq. at ¶ 16. Further, the Second Circuit has "never recognized cultural assimilation as a basis for a downward departure." *United States v. Ticas*, 219 Fed. Appx. 44, 45 (2d Cir. 2007). In short, defense counsel was not ineffective for failing to make a losing argument, and Petitioner fails the *Strickland* test, in that "counsel made [no] errors so serious that defendant was deprived of reasonably competent representation," nor did counsel's performance prejudice the defense. *Hernandez*, 202 F.3d at 488.

**B.      Petitioner Is Not Entitled to a New Sentence Based on Amendments to the Sentencing Guidelines**

Petitioner appears to argue that amendments to the Guidelines change the calculation of his criminal history. (Pet. at 1, 19).[6] Petitioner points to an amendment to U.S.S.G. §4A1.2,

---

[6] Page 18 of the Petition appears to be missing, and is not included in copies of the Petition that the Government received from the Court and from defense counsel.

Hon. Gerard E. Lynch
April 11, 2008
Page 12

which defines offenses to be used in calculations of criminal history. Amendment 709, which became effective on November 1, 2007, addresses the counting of multiple prior sentences in §4A1.2. It provides that if prior sentences were for offenses separated by an intervening arrest, they are to be considered separate offenses, and if the prior sentences were not separated by an intervening arrest, they are to be counted as separate sentences unless the sentences were for offenses named in the same charging document or imposed on the same day. *See* U.S.S.G. §4A1.2(a)(2) (Nov. 2007). Petitioner is not entitled to any relief under this amendment – even assuming, *arguendo*, that his criminal history calculation would change – because this amendment is not to be applied retroactively.

Title 18, United States Code, section 3582(c)(2) provides:

[I]n the case of a defendant who has been sentenced to a term of imprisonment based on a sentencing range that has subsequently been lowered by the Sentencing Commission pursuant to 28 U.S.C. § 994(o), upon motion of the defendant or the Director of the Bureau of Prisons, or on its own motion, the court may reduce the term of imprisonment, after considering the factors set forth in section 3553(a) to the extent that they are applicable, if such a reduction is consistent with applicable policy statements issued by the Sentencing Commission.

18 U.S.C. § 3582(c)(2). In U.S.C.G. §1B1.10, the Commission has identified the amendments that a court may apply retroactively pursuant to this authority and articulated the proper procedure for implementing the amendment in a concluded case. On December 11, 2007, the Commission issued a revised version of §1B1.10, which emphasizes the limited nature of relief available under 18 U.S.C. § 3582(c). Section 1B1.10(c) listed the amendments that could be applied retroactively pursuant to the policy statement, and Amendment 709 was not included on the list. See U.S. Sentencing Comm'n, "'Reader-Friendly' Version of Amendments on Retroactivity Effective March 3, 2008" (Dec. 11, 2007), http://www.ussc.gov/2007guid/030308rf.pdf.

Therefore, even if the Petition is construed as a motion for reduction of sentence under 18 U.S.C. § 3582(c)(2), Petitioner is not entitled to any sentence reduction because Amendment 709 is not retroactive.

Hon. Gerard E. Lynch
April 11, 2008
Page 13

## CONCLUSION

Accordingly, for the reasons stated above, the Petition should be denied.

Respectfully submitted,

MICHAEL J. GARCIA
United States Attorney
Southern District of New York

By: _Rebecca Rohr_
Rebecca A. Rohr
Assistant United States Attorney
(212) 637-2531

cc (via U.S. mail):    Hector Gabriel Perez-Gallegos
Steven M. Statsinger, Assistant Federal Defender

# EXHIBIT A

# PRESENTENCE REPORT

# NOT FILED
# ELECTRONICALLY

52I7PERP

 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   UNITED STATES OF AMERICA,

 4                v.                        04 Cr. 1274

 5   HECTOR GABRIEL PEREZ-GALLEGOS,

 6                Defendant.

 7   ------------------------------x

 8                                    February 18, 2005
                                      2:45 p.m.
 9

10   Before:

11                    HON. GERARD E. LYNCH
                                    District Judge
12

13                        APPEARANCES

14   DAVID N. KELLEY
          United States Attorney for the
15        Southern District of New York
     BY:  JILLIAN BERMAN
16        Assistant United States Attorney

17   STEVEN STATSINGER
          Attorney for Defendant
18
     ALSO PRESENT:  RUDOLFO TURENNE, Spanish Interpreter
19

20

21

22

23

24

25

52I7PERP

1          (Case called)

2          (In open court)

3          MS. BERMAN:  Good afternoon, your Honor.  Jillian

4    Berman for the government.  With me is Emily Kim, who is an

5    intern at Columbia Law School.

6          MR. STATSINGER:  Steven Statsinger from the federal

7    defender's office.  Good afternoon, your Honor.

8          THE COURT:  Good afternoon.

9          I guess we should start by swearing in the

10   interpreter.

11         (Interpreter sworn)

12         THE COURT:  All right.  Mr. Perez-Gallegos, I

13   understand that you wish to change your plea and to enter a

14   plea of guilty to certain charges, is that right?

15         THE DEFENDANT:  Yes, sir.

16         THE COURT:  OK.  And, Mr. Statsinger, there is no plea

17   agreement in this case?

18         MR. STATSINGER:  That's right, your Honor.

19         THE COURT:  Well, then I will ask the clerk to mark

20   the advice of rights form and verify the signature on that, and

21   then we will proceed.

22         DEPUTY COURT CLERK:  With respect to Court Exhibit 1,

23   the advice of rights form, Mr. Perez-Gallegos, is that your

24   signature, sir?

25         THE DEFENDANT:  Yes, sir.

52I7PERP

1          DEPUTY COURT CLERK:  And defense counsel, is that your

2     signature, sir?

3          MR. STATSINGER:  It is.

4          THE COURT:  All right.  Before deciding whether to

5     accept your guilty plea, I am going to ask you certain

6     questions, and it's very important that you answer these

7     questions honestly and completely.  The purpose of this

8     proceeding is to make sure that you understand your rights, to

9     decide whether you are pleading guilty of your own free will,

10    and to make sure you are pleading guilty because you are guilty

11    and not for some other reason.  Do you understand what I'm

12    saying?

13          THE DEFENDANT:  Yes, sir.

14          THE COURT:  OK.  And are you having any difficulty

15    understanding the interpreter?

16          THE DEFENDANT:  No, sir.

17          THE COURT:  OK.  If at any time you don't understand

18    anything or you want to consult with your lawyer, just say so,

19    because it's important that you understand every question

20    before you answer.  Now, Mr. Lopez, can you swear in the

21    defendant, please.

22          (Defendant sworn)

23          DEPUTY COURT CLERK:  Please state your name for the

24    record.

25          THE DEFENDANT:  Hector Gabriel Perez-Gallegos.

52I7PERP

1          THE COURT:   How old are you, sir?

2          THE DEFENDANT:   34.

3          THE COURT:   And how much education have you had?

4          THE DEFENDANT:   Ten years.

5          THE COURT:   And where was that?

6          THE DEFENDANT:   Honduras.

7          THE COURT:   Have you ever been treated or hospitalized

8   for any mental illness?

9          THE DEFENDANT:   No.

10          THE COURT:   Are you now or have you recently been

11   under the care of any kind of doctor?

12          THE DEFENDANT:   No.

13          THE COURT:   Have you ever been hospitalized or treated

14   for addiction to any drugs or to alcohol?

15          THE DEFENDANT:   No.

16          THE COURT:   Have you ever been addicted to any drugs

17   or to alcohol?

18          THE DEFENDANT:   No.

19          THE COURT:   Have you taken any kind of medicine or

20   pills, or drugs, or had any alcoholic beverages in the last 24

21   hours?

22          THE DEFENDANT:   No.

23          THE COURT:   Is your mind clear today?

24          THE DEFENDANT:   Yes.

25          THE COURT:   And do you understand what's happening in

52I7PERP

1    this proceeding?

2              THE DEFENDANT:  Yes.

3              THE COURT:  OK.  Does either counsel have any doubt as

4    to the defendant's competence to plead?

5              MS. BERMAN:  No, your Honor.

6              MR. STATSINGER:  No, your Honor.

7              THE COURT:  Nor do I, but I will make the complete

8    finding at the end of the proceeding.

9              Now, Mr. Perez-Gallegos, have you received a copy of

10   the indictment in this case which is the written version of the

11   charge against you?

12             THE DEFENDANT:  (In English) Yes, sir.

13             THE COURT:  And has that been read or translated to

14   you?

15             THE DEFENDANT:  (In English) Yes, sir.

16             THE COURT:  Do you want me to read it to you now in

17   open court?

18             THE DEFENDANT:  (In English) No, sir.

19             THE COURT:  All right.  Do you understand that you are

20   charged with a felony offense of illegally reentering the

21   United States after having been deported?

22             THE DEFENDANT:  (In English) Yes, sir.

23             THE COURT:  Have you had enough time and opportunity

24   to discuss your case with your attorney?

25             THE DEFENDANT:  (In English) Yes, sir.

52I7PERP

1      THE COURT:  All right.  Have you discussed with him

2  the charges against you, including this charge, as well as

3  anything else that may have been raised by the government in

4  the case?

5      THE DEFENDANT:  (In English) Yes, sir.

6      THE COURT:  Have you discussed with your attorney any

7  possible defenses you might have to the charges and all of the

8  facts about your involvement in this matter?

9      THE DEFENDANT:  (In English) Yes, sir.

10      THE COURT:  Has he told you the consequences of

11  pleading guilty?

12      THE DEFENDANT:  (In English) Yes, sir.

13      THE COURT:  And are you satisfied with your attorney's

14  representation of you?

15      THE DEFENDANT:  (In English) Yes, sir.

16      THE COURT:  All right.  I am now going to explain

17  certain constitutional rights that you have.  These are rights

18  that you will be giving up if you enter a guilty plea.  So,

19  please, listen carefully to what I'm about to say, and if at

20  any time you need a further explanation, stop me, and either I

21  or Mr. Statsinger will explain the matter more fully.

22      A few moments ago Mr. Lopez showed you the advice of

23  rights form that you signed.  Before you signed that form did

24  you read that or have it translated for you?

25      THE DEFENDANT:  (In English) Yes, sir.

52I7PERP

1    THE COURT:  OK.  I'm now going to go over some of the

2    same matters with you orally to make sure you understand what

3    you are doing here.

4    Under the Constitution and laws of the United States

5    you have a right to plead not guilty to the charges contained

6    in this indictment.  Do you understand that?

7    THE DEFENDANT:  Yes, sir.

8    THE COURT:  All right.  And if you did plead not

9    guilty, you would be entitled under the Constitution to a

10    speedy and public trial by jury on those charges.

11    At that trial you would be presumed to be innocent,

12    and the government would be required to prove you guilty beyond

13    a reasonable doubt before you could be found guilty.  That

14    means that you would not have to prove that you are innocent,

15    and you could not be convicted unless a jury of 12 people

16    unanimously agreed that you are guilty beyond a reasonable

17    doubt.  Do you understand that?

18    THE DEFENDANT:  (In English) Yes, sir.

19    THE COURT:  If you decided to go to trial, at that

20    trial and at every stage of your case you would have the right

21    to be represented by an attorney.  If you can't afford one, an

22    attorney would be appointed to represent you at government

23    expense and at no cost to you.  That means that Mr. Statsinger

24    is appointed to handle your case all the way through a trial if

25    you want one, not just for a guilty plea, and your decision to

52I7PERP

1    plead guilty should not depend on whether you can afford a

2    lawyer.  Do you understand that?

3            THE DEFENDANT:  (In English) Yes, sir.

4            THE COURT:  During a trial the witnesses for the

5    government would have to come to court and testify in your

6    presence, where you could see and hear them, and your lawyer

7    can cross-examine them.  If you wanted, your lawyer could offer

8    evidence on your behalf, and you would be able to use the

9    court's power to compel witnesses to come to court, to testify

10   in your defense even if they didn't want to come.  Do you

11   understand that?

12           THE DEFENDANT:  (In English) Yes, sir.

13           THE COURT:  At a trial you would have the right to

14   testify in your own defense if you wanted to, but you would

15   also have the right not to testify.  And if you chose not to

16   testify, that could not be used against you.  No inference or

17   suggestion of guilt could be made from the fact that you did

18   not testify.  Do you understand that?

19           THE DEFENDANT:  (In English) Yes, sir.

20           THE COURT:  If you were convicted at a trial, you

21   would have the right to appeal to a higher court.  Do you

22   understand that?

23           THE DEFENDANT:  (In English) Yes, sir.

24           THE COURT:  As I said before, you have a right to

25   plead not guilty.  Even now as you are here with the intention

52I7PERP

1    of entering a guilty plea you have an absolute right to change

2    your mind, persist in your not guilty plea and go to trial.

3    But if you do plead guilty and I accept your plea, you will be

4    giving up your right to a trial and all the other rights that

5    go with it that I've just described.  If you plead guilty,

6    there will be no trial, all that will remain is to impose

7    sentence.  You and the government will have a chance to make

8    arguments about what sentence you should get, but there will

9    not be any further trial of guilt or innocence.  Do you

10   understand that?

11             THE DEFENDANT:  (In English) Yes, sir.

12             THE COURT:  Finally, if you plead guilty you will be

13   giving up your right not to incriminate yourself, and I will

14   ask you questions about what you did to satisfy myself that you

15   are actually guilty.  By pleading guilty you will be admitting

16   that you are actually guilty.  Do you understand that?

17             THE DEFENDANT:  (In English) Yes, sir.

18             THE COURT:  All right.  You said before that you read

19   the indictment and you understand that you are charged with

20   illegally reentering the United States after deportation.  I'm

21   now going to tell you the elements of that offense.  That means

22   these are the things the government would have to prove beyond

23   a reasonable doubt if you went to trial.

24             The elements of that offense are, first, that sometime

25   in the past you were deported from the United States; second,

52I7PERP

1    that after you were deported you returned to the United States;

2    third, that you did this without getting permission from the

3    Attorney General to return to the United States; and, finally,

4    that you did these things knowingly and intentionally.

5         Do you understand those elements?

6         THE DEFENDANT:    (In English) Yes, sir.

7         THE COURT:    Now I'm going to tell you the maximum

8    possible penalty for this crime.    The maximum is the most that

9    could be imposed.    It doesn't mean that's what you will

10   necessarily receive, but you have to understand that by

11   pleading guilty you are exposing yourself to the possibility of

12   receiving any combination of punishments up to the maximum that

13   I'm about to describe.

14        In terms of restrictions on your liberty, the maximum

15   term of imprisonment for this crime is 20 years, and that could

16   be followed by up to three years of supervised release.

17        Supervised release means that if you are sentenced to

18   prison, after you get out you will be subject to supervision by

19   the prohibition department; you will have to follow certain

20   rules; and if you violate those rules, you could be sent back

21   to prison without a jury trial to serve additional time.    The

22   idea is like being on parole except that it comes after your

23   prison sentence is over.    You won't be released early.    In fact

24   you should understand that parole has been abolished in the

25   federal system.    If you are sentenced to prison, you will not

52I7PERP

1    be released early on parole.  Do you understand that?

2              THE DEFENDANT:  (In English) Yes, sir.

3              THE COURT:  OK.  In addition to these restrictions on

4    your liberty, the maximum allowable fine is $250,000.  In light

5    of the severity of the fine, it may seem trivial but I am also

6    required to tell you that there is a mandatory minimum

7    so-called special assessment or fine of $100 that's required to

8    be imposed on every count of conviction.

9              Please understand that I am only telling you about

10   those punishments that are part of the sentence.  Being

11   convicted of a felony even by a plea of guilty could have other

12   consequences like the loss of licenses, loss of the right to

13   possess a firearm.  Since you are not a citizen of the United

14   States you are almost certain to be deported again.  I'm not

15   trying to give you a full list.  I just want you to understand

16   that such consequences can result from conviction of a felony.

17   Do you understand that?

18             THE DEFENDANT:  Yes.

19             THE COURT:  Now, the actual sentence that you will

20   receive will be influenced by what are called the federal

21   sentencing guidelines.  Judges are required to consider the

22   guidelines in imposing sentence.  The guidelines are a set of

23   complex rules for determining a sentence based on what you did

24   and your prior criminal record.  Judges are required to

25   consider the guidelines but, in the end, the judge is required

52I7PERP

1    to give the sentence that best satisfies the purposes of

2    sentencing, even if that's higher or lower than the guideline

3    sentence.

4             Have you discussed the sentencing guidelines with your

5    attorney?

6             THE DEFENDANT:  (In English) Yes, sir.

7             THE COURT:  Now, in this case the government has

8    written a letter to Mr. Statsinger in which the prosecutor

9    explains how she thinks the sentencing guidelines apply to your

10   case, and that letter says that the prosecutor thinks that the

11   guidelines will provide for a sentence of between 46 and 57

12   months in prison.  Have you discussed that letter with counsel?

13            THE DEFENDANT:  (In English) Yes, sir.

14            THE COURT:  OK.  Now, you have to understand that

15   letter is just the prosecutor's present opinion.  She could

16   change her mind later, and it really doesn't matter what she

17   thinks anyway because the sentence is up to me.  And when I

18   review the guidelines, based on the probation report and the

19   lawyers' arguments, I might come to a different answer, or I

20   might think the case requires a higher or lower sentence than

21   the usual one provided by the guidelines.  The point is that

22   that letter does not represent a guaranty or a promise that

23   your sentence will be within that range.  Do you understand

24   that?

25            THE DEFENDANT:  (In English) Yes, sir.

52I7PERP

1      THE COURT:  All right.  You need to understand that no

2  one -- not your attorney, or the prosecutor, or even I -- can

3  be sure what your sentence will be.  I can't calculate the

4  sentence until I have received the presentence report, analyzed

5  the sentencing guidelines and decided whether there is any

6  basis for departing from the guidelines range.  But even if

7  your sentence is different from what your attorney or anyone

8  else has predicted, even if it's different from what you

9  expect, once you have pleaded guilty you will not be allowed to

10  withdraw your plea.  Do you understand that?

11      THE DEFENDANT:  (In English) Yes, sir.

12      THE COURT:  Has anyone threatened you or coerced you

13  in any way or tried to force you to plead guilty?

14      THE DEFENDANT:  (In English) No, sir.

15      THE COURT:  Has anyone promise you or offered you

16  anything to get you to plead guilty?

17      THE DEFENDANT:  (In English) No, sir.

18      THE COURT:  Now that you have been advised of the

19  charges against you, of the possible penalties that you face

20  and of the rights that you are giving up, is it still your

21  intention to plead guilty to this charge?

22      THE DEFENDANT:  (In English) Yes, sir.

23      THE COURT:  Can you tell me what you did that makes

24  you believe that are you guilty of the charge in the

25  indictment.

52I7PERP

1          THE DEFENDANT:  I reentered the country illegally.

2          THE COURT:  OK.  Before you reentered, you had been

3     here before?

4          THE DEFENDANT:  Yes.

5          THE COURT:  And at that time were you deported by the

6     immigration authorities?

7          THE DEFENDANT:  Yes, I was deported in '95.

8          THE COURT:  OK.  And did you know at the time that you

9     weren't allowed to come back into the United States?

10          THE DEFENDANT:  Yes.

11          THE COURT:  OK.  Ms. Berman, do you agree there is a

12     sufficient factual predicate for a guilty plea?

13          MS. BERMAN:  Yes, your Honor.  I would ask that the

14     defendant allocute as to what the conviction was that formed

15     the basis for his deportation.

16          THE COURT:  The first time that you were deported,

17     sir, this was after a criminal conviction of some kind?

18          THE DEFENDANT:  Yes, I was convicted of sale or

19     possession of cocaine.

20          THE COURT:  I see.  OK.  And when you came back, at

21     sometime after you came back to the United States were you here

22     in the City of New York?

23          THE DEFENDANT:  (In English) Yes.

24          THE COURT:  In Manhattan or the Bronx?

25          THE DEFENDANT:  (In English) Brooklyn.

52I7PERP

1       THE COURT:  What's the basis for venue here?

2       MS. BERMAN:  Your Honor, the venue is that the

3   defendant, his prior felony conviction was in the Southern

4   District, was in Manhattan, New York.

5       THE COURT:  And that's a basis for venue in a reentry

6   case?

7       MS. BERMAN:  May I have a moment?

8       THE COURT:  Well, before we get there.  Mr. Perez,

9   when you came back to the United States, you lived in Brooklyn?

10      THE DEFENDANT:  Yeah, I lived in Brooklyn.

11      THE COURT:  Did you ever come over to Manhattan?

12      THE DEFENDANT:  No.  Before leaving I would report to

13   the Manhattan court.

14      THE COURT:  I see.  Well, at any rate, Mr. Statsinger,

15   I think there is a legal question as to whether the venue is

16   properly here.  On the other hand, I don't know if there is any

17   reason why you want to be in Brooklyn.  And I guess that's a

18   question.  Does defendant have any objection to being tried and

19   sentenced here in the Southern District of New York?

20      MR. STATSINGER:  This is not something I caught when I

21   was reviewing everything, so I just need a word with Mr. Perez.

22      THE COURT:  OK, sure.

23      MR. STATSINGER:  I have discussed this with Mr. Perez.

24   I'm not sure that there is really Southern District venue, but

25   he is willing to waive a claim of improper venue and proceed

52I7PERP

1  here today.  It's also worth noting, in case someone here

2  doesn't know it, that a claim of improper venue is anyway

3  waived by a guilty plea under a case I think *Calderone*.  But we

4  are ready to proceed.

5       THE COURT:  I think that's right.  But at the same

6  time, you know, if there is a basis for some claim -- I'm not

7  sure there is.  I don't know.  Maybe Ms. Berman is right that

8  you can venue a reentry claim in the place where somebody was,

9  at least where they were deported from.  I don't know where

10  they were convicted of an underlying crime.  It seems like a

11  stretch to me, but I don't know what the answer is.

12       The question is just if there is an issue, I want to

13  make sure that the defendant is knowingly waiving it.  It's

14  certainly not a strange thing to waive, since the proceeding

15  would be the same across the river as it is here, so I don't

16  have a great deal of concern about it.  I just want to make

17  sure that the defendant knows that there is that claim and that

18  he is giving it up.  And I take it you have discussed it with

19  him and he is.

20       MR. STATSINGER:  That's right.  I have, and he is.

21       THE COURT:  All right.  And, Mr. Perez, you're

22  prepared to go ahead here today?

23       THE DEFENDANT:  (In English) Yes.

24       THE COURT:  All right.  Ms. Berman, does the

25  government represent it has sufficient evidence to establish

52I7PERP

1  guilt beyond a reasonable doubt?

2        MS. BERMAN:  Yes, your Honor.

3        THE COURT:  And, Mr. Statsinger, do you know of any

4  defense that would prevail at trial or any other reason why

5  your client should not be permitted to plead guilty?

6        MR. STATSINGER:  Other than lack of venue, which has

7  been waived, none, your Honor.

8        THE COURT:  OK.  Then, Mr. Perez-Gallegos, on the

9  basis of your answers to my questions and my observations of

10  you here today, I'm certain that you are competent to enter a

11  guilty plea, and I so find.  I am also satisfied that you

12  understand your rights, including your right to have a trial,

13  that you are aware of the consequences of your plea, including

14  the sentence that could be imposed, that you are pleading

15  guilty voluntarily and that you have admitted your guilt as

16  charged in this indictment.  For those reasons I accept your

17  plea of guilty and enter a judgment of guilt on that charge.

18        Now, the probation department is going to want to

19  interview you in connection with preparing its presentence

20  report.  That report will be important in my deciding what your

21  sentence should be.  You will be guided by your lawyer's advice

22  as to whether to answer questions and what questions to answer,

23  but if you do answer any questions it's very important that you

24  give the probation officer truthful, accurate information.

25  Giving false information could result in a higher sentence than

52I7PERP

1  you would otherwise receive.

2       After the presentence report is prepared, you and Mr.

3  Statsinger have a right to read it and to make any objections

4  and comments on it before sentencing.  I urge you to be sure to

5  read it and discuss it with your lawyer, and if you find any

6  mistakes, point them out to him so that he can bring them to my

7  attention before sentence.  The sentence will be when?

8       DEPUTY COURT CLERK:  Friday, May 27th at 2:15.

9       THE COURT:  All right.  And let me emphasize, I have

10 been trying to make the point to lawyers in criminal cases,

11 it's come to seem to me that sentences never take place when

12 they are said to, when they are set to take place, because

13 nobody actually prepares for them until it's too late.

14      I am trying to change that in my own little way, so my

15 expectation is that we will have the sentence on that date and

16 that counsel should make efforts to read the presentence report

17 promptly, and if you have any issues that you want to raise, or

18 anything you want to submit to the court, do it sufficiently in

19 advance of the sentencing that I can read the materials and be

20 ready to do sentence on the day that has been scheduled.

21      All right.  Unless there is any other application, I

22 will see you all in May.

23      MS. BERMAN:  Thank you, your Honor.

24      MR. STATSINGER:  Thank you.  Have a good weekend.

25      (Adjourned to May 27, 2005 at 2:15 p.m.)



FEDERAL DEFENDER DIVISION • SOUTHERN DISTRICT OF NEW YORK
52 DUANE STREET  10th FLOOR, NEW YORK, N.Y. 10007  TEL: (212) 417-8700  FAX: (212) 571-0392

*Southern District of New York*
*John J. Byrnes*
*Attorney-in-Charge*

June 6, 2005

*Federal Defender Division*
*Leonard F. Joy*
*Attorney-in-Charge*

<u>BY HAND DELIVERY</u>

Honorable Gerard E. Lynch
United States District Judge
Southern District of New York
United States Courthouse
40 Centre Street
New York, New York 10007

Re: <u>United States v. Hector Perez-Gallegos</u>
    <u>04 Cr. 1274 (GEL)</u>

Dear Judge Lynch:

This letter is respectfully submitted on behalf of Mr. Perez-Gallegos, in advance of his sentencing, which is presently scheduled for Friday, June 10, 2005. Mr. Perez-Gallegos, who pled guilty to illegally reentering the United States in order to be reunited with his son and common-law wife, has no objection to the facts set forth in the pre-sentence report. For the reasons that follow, however, the defense respectfully urges the Court to impose a non-guideline sentence considerably less than the seventy-seven month minimum recommended by the Sentencing Guidelines.

I.  <u>Mr. Perez-Gallegos' Background and Offense Conduct</u>

Hector Perez-Gallegos is a 34-year old citizen of Honduras, one of eight children born to Maria Dolores Gallegos-DePerez and Juan Pablo Perez. PSR at par. 39. He was raised in Honduras by his parents, who were both tailors, until he was twelve years old, when the combination of severe poverty and poor living conditions caused him leave home in search of work. PSR at par. 40. His siblings also began working at early ages because his parents' earnings were insufficient to support the family. PSR at par. 40.

In 1990, when he was twenty years old, Mr. Perez-Gallegos emigrated to the United States for economic reasons. PSR at par. 42. He lived with his sisters, who had been in this country for several years, and who had emigrated for the same reason. PSR at

Honorable Gerard E. Lynch
United States District Judge
Southern District of New York

June 6, 2005
Page 2

Re:  <u>United States v. Hector Perez-Gallegos</u>
     04 Cr. 1274 (GEL)

par. 42.  In approximately 1994, he met Claudia Maria Plata, his
common-law wife.  They have two children, Jerry Perez, who was
born before Mr. Perez-Gallegos was deported, and Jose Perez, who
is two years old. PSR at par. 45.

In the early 1990's, Mr. Perez-Gallegos was arrested three
times in New York State on drug-related charges. In April of
1994, he ultimately received concurrent terms of twenty to sixty
months' imprisonment for those three convictions. He was paroled
in November of 1994 and was deported on February 21, 1995. PSR at
pars. 4, 22-28.  Mr. Perez-Gallegos has reported to defense
counsel that he returned to the United States very soon after his
deportation because his wife and infant son were here.

As reflected, in the presentence report, Mr. Perez-Gallegos
sustained two burglary convictions in New Jersey after his return
to this country. PSR at pars. 29-37. He was released from prison
in or about 1999 and moved with his wife and children to Dunn,
North Carolina. PSR at par. 46. Since he made that move, Mr.
Perez-Gallegos has not had any further involvement in the
criminal justice system apart from the instant arrest.

Mr. Perez-Gallegos has reported to counsel that in 2004, he
opened a bar in Smithfield, North Carolina. His plan was that his
mother and sister would move to North Carolina and run the bar;
he was gong to return to Honduras to help care for his aging
father and youngest sisters. <u>See</u> Letter from Mr. Perez-Gallegos'
mother and sisters, attached hereto as Exhibit A. Mr. Perez-
Gallegos hoped that the income from the bar would be sufficient
to maintain his family here and in Honduras.

Mr. Perez-Gallegos' illegal presence in the United States
was detected when he applied for the liquor license necessary to
run the bar. His fingerprints revealed his true identity and
alien status.  He was arrested in North Carolina in October of
2004, and transported to New York. He arrived in New York on
November 17, 2004, and was imprisoned at Rikers Island on a
parole violation warrant. On or about December 15, 2004, Mr.
Perez-Gallegos was brought from state custody to federal custody
and presented on the instant illegal reentry charge.  As far as
he knows, the parole violation was dismissed.

Honorable Gerard E. Lynch
United States District Judge
Southern District of New York

June 6, 2005
Page 3

Re:  United States v. Hector Perez-Gallegos
     04 Cr. 1274 (GEL)

II.  United States v. Booker and the New Sentencing Process

As this Court is aware, the Supreme Court's recent decision
in United States v. Booker, 543 U.S. __, 125 S. Ct. 738 (2005),
has substantially altered a sentencing court's obligations with
respect to sentencing.  Previously, a court, absent extraordinary
circumstances warranting departure, was required to impose a
sentence within the range mandated by the Sentencing Guidelines.
Now, the guideline range is just one of several factors set forth
in 18 U.S.C. § 3553(a) that a sentencing court must consider in
determining the appropriate, "reasonable" sentence.  See also
United States v. Crosby, 397 F.3d 103, 111 (2d Cir. 2005) ("Now,
with the mandatory duty to apply the Guidelines excised, the duty
imposed by section 3553(a) to 'consider' numerous factors
acquires renewed significance."); United States v. Fleming, 397
F.3d 95, 100 (2d Cir. 2005) (holding, in analogous context of
supervised release violation sentencing, that the requisite
"consideration" has occurred "[a]s long as the judge is aware ...
of the sentencing range or ranges that are arguably applicable");
United States v. Rubenstein, 403 F.3d 93, 102 (2d Cir. 2005)
(Cardamone, J., concurring) (noting, in light of Booker, that "it
is entirely possible that a correctly calculated Guidelines
sentence might nonetheless be found to be unreasonable upon
consideration of other [§ 3553(a)] factors.")

In Crosby, the Court of Appeals explained the process that
district court's should follow, post-Booker, in selecting a just
and appropriate sentence.  First, a court must "consider the
Guidelines and all the other factors" contained in 18 U.S.C. §
3553(a). 397 F.3d at 113. It must then determine whether to
impose the sentence that "would have been imposed under the
Guidelines, i.e., a sentence within the applicable Guideline
range or within permissible departure authority" or to "impose a
non-Guidelines sentence." Id. (emphasis added). A "non-Guidelines
sentence" is one that is the product of the Court's traditional
sentencing discretion and is "neither within the applicable
Guidelines range nor imposed pursuant to the departure authority
in the Commission's policy statements." Id. at 113, n.9.

Section 3553(a) directs the Court to impose a sentence that
is "sufficient, but not greater than necessary, to comply with
the purposes set forth in paragraph 2." Those purposes are:

Honorable Gerard E. Lynch
United States District Judge
Southern District of New York

June 6, 2005
Page 4

Re: <u>United States v. Hector Perez-Gallegos</u>
    04 Cr. 1274 (GEL)

(A)    to reflect the seriousness of the offense, to
       promote respect for the law, and to provide just
       punishment for the offense;

(B)    to afford adequate deterrence to criminal conduct;

(C)    to protect the public from further crimes of the
       defendant; and

(D)    to provide the defendant with needed educational
       or vocational training, medical care, or other
       correctional treatment in the most effective
       manner.

     To arrive at a just sentence, the Court is further directed
to consider: (1) the nature and circumstances of the offense and
the history and characteristics of the offender; (2) the kinds of
sentences available; (3) the kinds of sentence and the sentencing
range established in the Sentencing Guidelines; (4) policy
statements issued by the Sentencing Commission; (5) the need to
avoid unwarranted sentence disparities among similarly situated
defendants; and (6) the need to provide restitution to any
victims of the offense.  18 U.S.C. § 3553(a)(1), (a)(3)-(7).

III. <u>Application of Section 3553(a) Factors to Mr. Perez-Gallegos</u>

     The Probation Department has calculated that the advisory
sentencing range applicable to Mr. Perez-Gallegos is seventy-
seven to ninety-six months, based on an offense level of twenty-
one and a criminal history category of VI. However, the defense
respectfully submits that a consideration of all of the section
3553(a) factors justifies a non-Guidelines sentence lower than
the minimum of the advisory range.  <u>See</u> <u>United States v. Huerta-
Rodriguez</u>, 355 F.Supp.2d 1019, 1026-27 (D.Neb. 2005)(noting that,
with respect to illegal reentry sentences, "the Guidelines do not
necessarily represent a reliable indication of reasonableness in
every case").

A.    <u>A Non-Guidelines Sentence of Less Than Seventy-Seven Months'
      Imprisonment Is Reasonable</u>

     The Sentencing Guidelines are just one of several factors a
Court must consider before determining what sentence is
"sufficient but not greater than necessary to comply with the

Honorable Gerard E. Lynch                        June 6, 2005
United States District Judge                        Page 5
Southern District of New York

Re: <u>United States v. Hector Perez-Gallegos</u>
    04 Cr. 1274 (GEL)

purposes" of sentencing. 18 U.S.C. § 3553(a). For the reasons
that follow, a non-Guidelines sentence is appropriate in this
case.

First, the advisory range of 77 to 96 months' imprisonment is
unreasonable because it "double counts" Mr. Perez-Gallegos'
criminal history, recommending that it be used to enhance his
guideline score along both dimensions. The illegal reentry
guideline makes such a recommendation even though courts have
traditionally viewed a person's criminal history as reflecting
only the likelihood of recidivism (measured by the criminal
history category under the Guidelines), but have not typically
factored it into a measure of the seriousness of the offense of
conviction (measured by the offense level under the Guidelines).
Indeed, for this very reason, the offense guidelines contained in
Chapter Two of the Guidelines manual hardly ever factor a
defendant's criminal record into the offense level score. The
Sentencing Commission has provided no explanation why illegal
reentry offenses should be treated in this somewhat aberrational
manner.[1]

Absent some justification for the Sentencing Guidelines'
approach, it would be unreasonable to follow a recommendation
that deviates from the path that sentencing courts have
traditionally followed. Indeed, one court in has already
identified this arbitrary aspect of the illegal reentry guideline
as a ground for imposing a non-Guidelines sentence. <u>United States
v. Galvez-Barrios</u>, 355 F. Supp. 2d 958, 963 (E.D.Wis.
2005)("Although it is sound policy to increase a defendant's
sentence based on his prior record, it is questionable whether a
sentence should be increased twice on that basis"); <u>see also</u>
<u>United States v. Ramon Ramirez</u>, 04 Cr. 1021 (JSR)(citing this
aspect of the Guidelines in justifying a non-Guidelines
sentence).

As a result of this double counting, Mr. Perez-Gallegos'

---

[1] Equally aberrational is the sixteen-level offense level
increase for persons deported after conviction for an aggravated
felony, one of the largest single increases in the Sentencing
Guidelines manual. The Sentencing Commission has not explained
how it arrived at this seemingly totally arbitrary number.

Honorable Gerard E. Lynch
United States District Judge                              June 6, 2005
Southern District of New York                            Page 6

Re: <u>United States v. Hector Perez-Gallegos</u>
    04 Cr. 1274 (GEL)

guideline range is substantially higher than it otherwise would
have been. Under the Sentencing Guidelines, his offense level was
increased by sixteen levels, from eight to twenty-four, based
solely on one of his 1994 drug convictions, even though that
same conviction was also fully accounted for in his criminal
history score. If that conviction were not double-counted in the
offense level, Mr. Perez-Gallegos' guideline sentencing range
would be twelve to eighteen months' imprisonment (an offense
level of six and a criminal history category of VI).

Second, one of the the section 3553 factors is "the need to
avoid unwarranted sentence disparities among defendants with
similar records who have been found guilty of similar conduct."
U.S.S.G. § 3553 (a)(6). This factor also suggests that lower
sentence would be appropriate here. In <u>Galvez-Barrios</u>, the court
discussed this issue in great depth, noting that in districts
with so-called "fast track" programs for dealing with illegal
reentry cases, offenders are permitted, through charge bargaining
and stipulated departures, to agree to a speedy removal and
receive a reduced sentence. <u>Id</u>. In light of this, strict
adherence to the Sentencing Guidelines in illegal reentry cases
in districts without such "fast track" program can, itself,
result in unwarranted disparities for similarly situated
defendants.[2]

_____

[2] In one recent sentencing submission, the government
disclosed that 13 of the 94 federal districts (roughly 14%) have
"early disposition programs" for illegal reentry cases. The
districts include Arizona, all four California districts, Idaho,
Nebraska, New Mexico, North Dakota, Oregon, the Southern and
Western Districts of Texas, and the Western District of
Washington. The government has claimed that the disparities
created by such programs are "warranted" because some districts
have convinced the Attorney General or the Deputy Attorney
General that there are "exceptional circumstances" created by the
large volume of reentry cases in those districts. The government
has not claimed, however, that the Southern District of New York
has fewer illegal reentry cases than, say, the District of
Nebraska. Nor has the government explained how the fact that
such programs are designed to dispose of large numbers of cases
means that the resulting nationwide disparities are "warranted"
when viewed from the perspective of the individual defendant

Honorable Gerard E. Lynch
United States District Judge
Southern District of New York

June 6, 2005
Page 7

Re: <u>United States v. Hector Perez-Gallegos</u>
    04 Cr. 1274 (GEL)

As Judge Kaplan wrote in <u>United States v. Bonnet-Grullon</u>, 53 F. Supp. 2d 430, 435 (S.D.N.Y 1999), "it is difficult to imagine a sentencing disparity less warranted than one which depends upon the accident of the judicial district in which the defendant happens to plead." In <u>Bonnet-Grullon</u>, though troubled by the unwarranted sentencing disparity, Judge Kaplan determined that he lacked the authority to depart downward based on his review of then-governing Second Circuit law. On appeal, the Second Circuit agreed that such a departure would be impermissible. <u>United States v. Bonnet-Grullon</u> 212 F.3d 692 (2d Cir. 2000).

It is absolutely clear, however, that under <u>Booker</u> this issue has been reopened. A case no longer needs to meet the narrow Guidelines criteria for a downward departure in order for the court to impose a sentence that is lower than the bottom of the range. Indeed, Judge Kaplan himself is now reconsidering this question. In <u>United States v. Krukowski</u>, 04 CR 1308 (LAK), he indicated that he remains deeply troubled by the prospect that an illegal reentry offender's sentence could be so heavily determined by the place in which he is found and prosecuted. Judge Kaplan has ordered the government to provide a detailed description of the fast-track programs in other districts.[3]

Third, Mr. Perez-Gallegos returned to the United States after being deported to be reunited with his common-law wife and child. While his case would be more sympathetic had he not sustained additional convictions once he returned, the defense nevertheless submits that Mr. Perez-Gallegos has already been penalized substantially for those offenses. Moreover, Mr. Perez-Gallegos' conduct during the past several years shows that he has managed to completely turn his life around. He sustained no new arrests between his 1999 release from imprisonment and 2004, when his illegal presence in this country became known. Moreover, Mr.

---

unfortunate enough to have been arrested in a district without a fast-track program.

[3] As far as counsel knows, to date, neither Judge Kaplan nor any other judge in this District has received a complete and honest accounting from the government about the scope, prevalence and operation of such "fast track" programs nationally.

Honorable Gerard E. Lynch
United States District Judge
Southern District of New York

June 6, 2005
Page 8

Re:  United States v. Hector Perez-Gallegos
     04 Cr. 1274 (GEL)

Perez-Gallegos had already come to the realization that he could
not remain in this country legally. He was planning to start a
business that his mother and sister could run so that he could
return to Honduras to help care for those of his family members
who are still there. In light of this, the risk of recidivism
here sufficiently reduced such that a seventy-seven month
sentence is unnecessary to "protect the public from further
crimes of the defendant." 18 U.S.C. § 3553(a)(2)(C).

     For all of these reasons, a non-Guidelines sentence
substantially lower than seventy-seven months' imprisonment will
punish Mr. Perez-Gallegos sufficiently for his offense.

IV.  Conclusion

     Mr. Perez-Gallegos accepts full responsibility for illegally
reentering the United States, and he understands that he must be
punished. For the reasons advanced above, however, the defense
respectfully submits that a sentence far lower than seventy-seven
months' imprisonment will be adequate to satisfy all of the
statutory goals of sentencing.

                              Respectfully submitted,

                              STEVEN Y. STATSINGER
                              Attorney for Hector Perez-Gallegos
                              (212) 417-8736

cc:  Jillian B. Berman,
     Assistant United States Attorney

May 14, 2005
New Jersey
Subject: Hector Gabriel Perez Gallegos.
        ID # 57191054


Your Honor, Judge Lych:

We, Hector's family, are inquiring if it is possible to send Hector to Honduras as soon as possible. His family really needs him there.

Our father is a very old man. He is suffering a lot because of Hector situation and is also taking care of our three younger sisters, 12, 15 and 18 years old.

Hector also has 2 children and a wife. The children are 2 and 9 years old. He was the head of his family and his wife is currently having financial problems.

We hope you consider our appeal to let Hector go to Honduras.

        Thank You.

Sincerely.

_Jeri Matthews._          _Iris Martinez_          Maia D. Perez
his Sister               his Sister              his Mother.

5758PERS

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4                v.                          04 Cr. 1274 (GEL)

5    HECTOR GABRIEL PEREZ-GALLEGOS,

6                Defendant.

7    ------------------------------x

8                                       July 5, 2005
                                        3:40 p.m.
9
     Before:
10
                        HON. GERARD E. LYNCH
11
                                        District Judge
12
                             APPEARANCES
13
     DAVID N. KELLEY
14        United States Attorney for the
          Southern District of New York
15   JILLIAN BERMAN
          Assistant United States Attorney
16
     STEVEN STATSINGER
17        Attorney for Defendant

18

19   Also present:  David Mintz, Spanish interpreter

20

21

22

23

24

25

5758PERS

1              (Case called)

2              THE DEPUTY CLERK:  Counsel, please identify yourselves

3     for the record.

4              MS. BERMAN:  Good afternoon, your Honor.  Jillian

5     Berman on behalf of the government.

6              THE COURT:  Good afternoon, Ms. Berman.

7              MR. STATSINGER:  Steven Statsinger, from the Federal

8     Defender's Office.  Good afternoon, your Honor.

9              THE COURT:  Good afternoon, Mr. Statsinger.

10             We are here today to impose sentence in United States

11    v. Hector Perez-Gallegos.

12             I have reviewed the presentence report and also the

13    submissions on behalf of the defendant and the government.

14             Mr. Statsinger, I know that you have from your

15    submission, but let me ask you for the record, have you

16    reviewed the presentence report and discussed it with your

17    client?

18             MR. STATSINGER:  Yes, I have, your Honor.

19             THE COURT:  Mr. Perez, have you read the presentence

20    report or had it translated for you into Spanish?

21             THE DEFENDANT:  Yes.

22             THE COURT:  Have you discussed it with Mr. Statsinger?

23             THE DEFENDANT:  Yes.

24             THE COURT:  Have you had a chance to discuss with him

25    any errors that you may have found in the report or anything

5758PERS

1    else that you think should be taken up with the court here

2    today?

3              THE DEFENDANT:  Yes.

4              THE COURT:  Ms. Berman, have you reviewed the

5    presence report?

6              MS. BERMAN:  Yes, your Honor.

7              THE COURT:  Any objections to the report concerning

8    factual accuracy?

9              MS. BERMAN:  No, your Honor.

10             THE COURT:  Since the Supreme Court's decision in

11   United States v. Booker, the court is no longer required to

12   follow the sentencing guidelines; however, we are still

13   required to consider the applicable guidelines, and in doing so

14   it is necessary that we accurately calculate the guideline

15   sentencing range.

16             Are there any disputed issues with respect to the

17   application of the sentencing guidelines?

18             MR. STATSINGER:  No, your Honor.

19             THE COURT:  Then based on my independent evaluation of

20   the sentencing guidelines, and the parties lack of objection, I

21   accept the guideline calculation in the presence report and

22   find that the offense level is 21, the Criminal History

23   Category is VI, and the guideline range is 77 to 96 months of

24   imprisonment.

25             I should add that I have considered whether the

5758PERS

1    defendant's Criminal History Category significantly overstates

2    the defendant's criminal history and potential for recidivism.

3    I do consider that issue fairly frequently because the method

4    of calculating Criminal History scores is necessarily somewhat

5    approximate and it is often the case that that calculation

6    either overestimates or underestimates the defendant's actual

7    potential for wrongdoing.

8            This defendant has five felony convictions.  I noted,

9    however, that these result from only two court proceedings and

10   led to only two jail sentences.  The offenses are relatively

11   low-level narcotic sales in New York and a series of burglaries

12   in New Jersey.

13           Criminal History Category VI is the highest category

14   there is, and this criminal record is certainly not the worst I

15   have seen by a long shot.  On the other hand, when carefully

16   considering the details of the cases, I noted that the three

17   New York cases related to three widely separate drug offenses

18   committed over a period of a year and a half and the second two

19   were committed while Mr. Perez was on bail from the first.

20   Meanwhile, the New Jersey convictions stemmed from two separate

21   indictments and each indictment appeared to involve more than

22   one act of theft or burglary.

23           So while the seriousness of the criminal record could

24   reasonably be disputed, as to exactly how bad it is, it is

25   certainly clear that the defendant is a persistent offender,

5758PERS

1    and while the Criminal History score appears high, I can't in

2    good conscience say that it significantly overstates his

3    potential for criminal activity.

4         Therefore, while I put this all on the record so that

5    any reviewing court can have the benefit of my thinking on the

6    subject, I determined not to pursue the possibility of a

7    downward departure on that ground.

8         I recognize that a departure, a so-called horizontal

9    departure in terms of the nature of the Criminal History score

10   is something that the court always has the authority to do, and

11   recognizing that authority I considered it and decided in my

12   discretion it was not something that I would do or even would

13   put to the parties and ask for comment on by the government,

14   because since it wasn't requested by the defendant or referred

15   to in the presentence report, if I were interested in doing it,

16   I would have to give the government notice in advance.

17        But anyway, that is more for the record than anything

18   else, and with that I will hear from the parties about any

19   issues they want to raise, starting with Mr. Statsinger.

20        MR. STATSINGER:  Thank you, your Honor.

21        As the court is aware, we have asked in writing and

22   continue to ask the court to consider imposing a nonguideline

23   sentence lower than the 77-month minimum recommended by the

24   sentencing guidelines.

25        While I fully recognize that Mr. Perez-Gallegos' past

5758PERS

1  criminal record presents something of an obstacle to that, I

2  think there are some very important mitigating factors that the

3  court should consider in looking at his history and character

4  in determining whether a nonguideline sentence would be

5  appropriate.

6      I think the most significant is that

7  Mr. Perez-Gallegos's criminal history abruptly ended in 1999

8  when he moved to North Carolina with his wife and family and

9  was making an effort, albeit -- although he was present in this

10 country illegal, was making an effort to live as law-abiding a

11 life as he could under these circumstances.

12     So I do think that this long, really five-year period,

13 uninterrupted by any arrests, suggests that he was making some

14 real progress in his life.  In fact, but for the -- this is not

15 in the presentence report, but it's in my letter.  But for the

16 fact that Mr. Perez had applied for a liquor license and that

17 revealed his true identity and resulted in Immigration

18 authorities grabbing him, he might very well be continuing, now

19 it is a year later, to have lived in this law-abiding, if

20 illegally, present way.

21     Mr. Perez is clearly someone with very strong family

22 ties.  His family did write a very nice letter about him to the

23 court.  Mr. Perez has advised me that really his plan all along

24 was sort of to set things up so he can return to Honduras

25 voluntarily and take care of his elderly father.

5758PERS

1    He has advised me that now most of his family has

2  already gone back, including his wife and children, because

3  they were having financial problems here.  If indeed it's true

4  that these people are all there, it reduces his incentive to

5  come back again and it does suggest that a sentence of

6  something less than 77 months would be adequate to punish him

7  for what he did because the need for deterrence would be

8  reduced.

9    The other issues that I have raised are not specific

10  to Mr. Perez but are issues that we would ask the court to

11  consider in all illegal reentry cases.

12    The first is whether increasing both his Criminal

13  History score and his offense level due to his past criminal

14  conduct in some way unfairly or unreasonably increases both

15  dimensions on this punishment.  The other thing to consider are

16  the regional disparities that are the result of fast-track

17  programs and to consider whether those create -- well, they

18  clearly create a disparity, but to consider whether, at least

19  from the perspective of Mr. Perez-Gallegos, those disparities

20  are warranted or unwarranted.

21    I am not going to dwell on those because those have

22  been extensively briefed in every other illegal reentry case,

23  and I know that the court already has some thoughts on those

24  issues.

25    But I do think that the totality of all the

5758PERS

1    circumstances here, particularly the five-year clean record

2    that Mr. Perez was able to eek out during the time he was in

3    the Carolinas, suggests that the guideline sentence is

4    unreasonable, and we would again to ask the court to impose a

5    lower one.

6            THE COURT:  Thank you, Mr. Statsinger.

7            Ms. Berman, how does he come to be here?  What is the

8    venue if he was detected -- I don't know where he was

9    arrested -- if he was detected in North Carolina?

10            MS. BERMAN:  Your Honor actually picked up on this at

11    the plea, and the defendant waived venue at that point.  You

12    are correct, he was picked up in North Carolina.

13            THE COURT:  I had forgotten that the issue came up,

14    and certainly at this point we are past any issue of venue

15    since I suppose it would have been waived one way or the other

16    by a guilty plea, not being a jurisdictional matter.  I am

17    curious as to what the mechanism is that leads him to be

18    prosecuted here.

19            MS. BERMAN:  He was detected -- the facts are not

20    completely fresh in my mind, but my recollection is that when

21    his fingerprints came up on the system, based on this North

22    Carolina liquor application, New York State parole authorities

23    were notified because of an outstanding, I think it was an

24    outstanding parole warrant or parole violation of some sort.  I

25    am not positive about that, but in any event. . .

5758PERS

1          MR. STATSINGER:  That is correct, your Honor.

2          THE COURT:  So he first came to the attention of the

3   New York State authorities.

4          MS. BERMAN:  Who then contacted Immigration and

5   Customs Enforcement.

6          THE COURT:  It is correct, then, in the government's

7   view as well that what brought Mr. Perez-Gallegos to anyone's

8   attention is this voluntary act of applying for the liquor

9   license.

10         MS. BERMAN:  That's correct.

11         THE COURT:  Does the government have any view on that?

12         The sentence here is a particularly lengthy one, and

13   of course in some sense the defendant has earned that by his

14   history of criminal activity and then his return to the United

15   States.

16         On the other hand, unlike the typical case of this

17   kind that I see, where the defendant comes to the attention of

18   the authorities because he is up to his old no good, in this

19   case it does seem somewhat unusual that the defendant

20   apparently has lived here for quite some time on this return.

21   It's a little unclear how long it is.

22         I guess there is some contradictory information in the

23   presentence report as to when he came back.  I think he said he

24   came back in 2000 via Texas.

25         MR. STATSINGER:  What he said, at least through me in

5758PERS

1    the sentencing submission, is that he actually came back

2    relatively soon after he was deported.  The deportation being

3    in 1995.

4          THE COURT:  He came back in 1995, but then the New

5    Jersey troubles were after that history.

6          MR. STATSINGER:  That's right.

7          THE COURT:  Then he spent some time in jail, and at

8    that point nobody picked up the immigration issue and he just

9    was released and did whatever he did thereafter.

10          It's a remarkably long time for the American taxpayer

11    to be supporting Mr. Perez, isn't it, before an inevitable

12    second deportation for somebody who was apparently causing no

13    trouble for quite some time?

14          MS. BERMAN:  Your Honor, I would respectfully submit

15    that, while I see your Honor's point of view, this was

16    certainly the first indication that came to federal

17    authorities, immigration authorities, that he was back in the

18    United States when he applied for the fingerprint, and you're

19    correct, his criminal record does not reflect any additional

20    arrests after the 1998, I believe it was, conviction.

21          Typically illegal, at least in the more standard case,

22    illegal entrants are arrested more quickly after coming back

23    into the United States.

24          THE COURT:  I don't know that that's so.  They get

25    arrested when and if they get arrested.

5758PERS

1      I am certainly not faulting the Immigration

2   authorities for not catching him.  That's not the point.

3      The point is that often people with this kind of

4   criminal record bring themselves to the authorities' attention

5   by committing another crime, not by being so foolish as to put

6   down their fingerprints on a government application that leads

7   to their history being uncovered.

8      I am just concerned that, despite the seriousness of

9   the criminal history -- maybe I am rethinking the issue of the

10  Criminal History Category.  But focusing again on the length of

11  time that, as far as we can see, that the defendant has stayed

12  out of trouble, I am wondering whether that's not a reason why

13  a somewhat lower sentence might be appropriate.

14      MS. BERMAN:  My position would be simply that I

15  believe the guideline range is reasonable in light of the fact

16  that your Honor has concluded that the Criminal History

17  Category is not unreasonable in light of his prior convictions,

18  all of which you correctly noted arose from separate events,

19  and in light of the offense level which was calculated based on

20  findings made by the Sentencing Commission.  I don't believe

21  that his being in the United States for as long as he has

22  without being arrested is such a mitigating circumstance.

23      THE COURT:  It's a curious business.  Of course, the

24  longer he violates the law by staying in the United States, the

25  more he can claim that he has rehabilitated himself, I suppose.

5758PERS

1    Mr. Perez-Gallegos, is there anything you wish to say
2    before sentence is imposed?
3    THE DEFENDANT:  All I can do is apologize for having
4    entered the country, and I promise that I will never return to
5    the country again because I have no means of making a living
6    here as an illegal person.  Above all, that's what I have to
7    say.  I apologize to the American people.
8    THE COURT:  All right.  Thank you, sir.
9    In these illegal reentry cases, I am often torn.  The
10    sentences imposed by the sentencing guidelines are particularly
11    severe.  At the same time, the primary purpose of sentencing in
12    cases of this kind seems to me to be punishment and deterrence.
13    There is a limited need to protect the public since the
14    defendant will be deported in any event.
15    Under these circumstances, it seems to me there is a
16    particular premium on adhering to the guideline recommendation.
17    The purposes of sentencing that are most relevant are the ones
18    that are least individualized, the ones in which the general
19    perspective of the Sentencing Commission on what is necessary
20    for deterrence and maintaining respect for law outweigh the
21    individualized aspects of the case.  The cases are fairly
22    standard, and the need to treat similarly-situated persons
23    similarly, which is another factor in sentence under the
24    statute, further supports the imposition of the guideline
25    sentence.

5758PERS

1    The only mitigating circumstance that I think has any

2    significance in this case is the time period in which the

3    defendant has avoided trouble with the law.  But his

4    significant criminal history, his apparent history of resisting

5    arrest when apprehended, provide additional arguments against

6    any unusual leniency.

7    I pause here briefly to address two arguments made by

8    the defense.

9    First, I reject the idea that I should reassess the

10    way the sentencing guidelines calculate their recommendation

11    and treat reentry after being deported for committing a serious

12    crime as a less serious offense than the Commission does.  It's

13    quite correct that the statute requires me to take into account

14    the characteristics of the offense and the offender.  But even

15    under Booker I don't think it's appropriate in any but the most

16    extreme of circumstances for an individual judge to impose a

17    lower sentence simply because he or she disagrees with the

18    Sentencing Commission about the seriousness of a particular

19    offense.

20    Even assuming there is any discretion to do that, I

21    wouldn't exercise it in the ordinary case.

22    I don't think there is anything strange about what

23    Mr. Statsinger calls double counting.  The offense of

24    reentering the United States is much less serious and

25    threatening when the offense is committed by an otherwise

5758PERS

1    law-abiding economic immigrant than when it's committed by a

2    drug-dealing felon.  That is a separate issue from the attempt

3    to exactly measure the offender's Criminal History score, which

4    is an effort to assess his dangerousness.

5            I think that the difference between ordinary reentries

6    and reentries by convicted felons is appropriately considered

7    as part of the offense conduct, and I don't think it's really

8    double counting.

9            Second, I also don't think it would be right in the

10   name of avoiding disparity to give the defendant the benefit of

11   the special reduction which apparently is made available by the

12   government in certain other districts.  Mr. Statsinger is

13   correct that it would be arbitrary to make the sentence one

14   year in one district and two years in the next based simply on

15   what district you are in.  But if it's wrong to say you should

16   get a longer sentence just because it's New York and that's how

17   we do things here, that's not what is happening.

18           I don't think it's wrong to have sentences vary

19   depending on the actual conditions in different districts to

20   take note of particular local problems.  Whether district by

21   district or individual case by individual case, the government

22   has always, and will always, give special consideration to

23   certain defendants in order to save resources and advance

24   criminal calendars.  That results in different sentences for

25   different people for reasons not having to do with culpability.

5758PERS

1   It's a part of the plea bargaining system that we are all used

2   to.

3         The fact that the government for its own reasons makes

4   special plea bargains available in a few districts does not

5   mean that everyone else in the country should get the same

6   sentence anymore than when the government makes a concession to

7   a particular defendant to save the resources involved in trying

8   the case.

9         So I don't think either of those arguments are very

10  persuasive.

11        While I thought hard about whether the defendant's

12  several years of avoiding legal troubles should count in his

13  favor, at the end I think that's simply a factor that is taken

14  into account by the guidelines in assessing a Criminal History

15  Category.  I think that's just one of the many vagaries of

16  criminal history.

17        In looking at the overall category, I think that the

18  category does reflect a serious risk of recidivism and a

19  serious criminal history.

20        I guess I want to be very clear with respect to the

21  language that I use here.  I realize that I no longer need to

22  make the kind of findings that would have justified a departure

23  under the guidelines, but I still think that, for the reasons I

24  have stated, in the ordinary reentry case it's appropriate to

25  follow the recommendation of the sentencing guidelines, and

5758PERS

1    having carefully considered the particular characteristics of

2    this case and of this defendant, I don't see a reason why I

3    should not do that here.  I think the arguments in favor of

4    adhering to the guideline sentence to accomplish the purposes

5    of punishment, deterrence, and avoiding sentencing disparity

6    outweigh any other considerations in the case.

7            Accordingly, you are committed to the custody of the

8    Bureau of Prisons for 77 months, to be followed by three years

9    of supervised release.

10           All standards and mandatory conditions of supervised

11   release apply.

12           There will be a special condition of supervised

13   release that you comply with all lawful directives of the

14   Bureau of Immigration and Customs Enforcement and with all

15   immigration laws.

16           There will be no fine because the probation department

17   reports you are unable to pay one, except for the mandatory

18   $100 special assessment.

19           That is the sentence of the court.

20           You have a right to appeal from your conviction,

21   including to appeal the sentence imposed.

22           There are strict deadlines for filing a notice of

23   appeal.  I strongly advise you to consult with Mr. Statsinger

24   right away as to whether to file a notice of appeal.  If there

25   is any doubt, you can file a notice now and decide later

5758PERS

1  whether you want to withdraw the appeal or not.

2          I direct that a complete copy of the presentence

3  report be prepared for the Bureau of Prisons and for the

4  Sentencing Commission, that counsel on appeal, if any, have

5  access to the report, and that the clerk prepare the judgment

6  and see to sending the required documentation to the Sentencing

7  Commission.

8          Are there any further applications?

9          MR. STATSINGER:  I have one, your Honor.  Mr. Perez

10 has advised me that his last few remaining family members in

11 this country reside in New Jersey.  So we would ask that the

12 court recommend that the Bureau of Prisons make every effort to

13 lodge him at a facility near his family in New Jersey.

14         THE COURT:  I will do that.

15         The judgment will reflect the court's recommendation

16 that, to the extent it's possible, consistent with his security

17 level and other appropriate considerations, that the defendant

18 be assigned to an institution in or as near as possible to the

19 State of New Jersey.

20         If there is nothing else, we will stand adjourned.

21         MS. BERMAN:  Thank you, your Honor.

22         MR. STATSINGER:  Thank you.

23         (Adjourned)

24

25